IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
November 18, 2025 Session

## JABRIEL LINZY v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
No. 114112          G. Scott Green, Judge

_____

## No. E2024-01561-CCA-R3-PC

_____

In 2015, a Knox County jury convicted the Petitioner, Jabriel Linzy, of first-degree murder, attempted first-degree murder, and employment of a firearm during the commission of a dangerous felony. The trial court sentenced him to life in prison for the first degree murder conviction, fifteen years for the attempted first degree murder conviction, and six years for the conviction of employing a firearm during the commission of a dangerous felony. The trial court ordered that the two shorter sentences be served consecutively to each other but concurrently with the life sentence. The Petitioner appealed his convictions, and this court affirmed. *State v. Linzy*, No. E2016-01052-CCA-R3-CD, 2017 WL 3575871, at *1 (Tenn. Crim. App. Aug. 18, 2017), *perm. app. denied* (Tenn. Nov. 16, 2017). The Petitioner filed a petition for post-conviction relief. After a hearing, the post-conviction court granted post-conviction relief, concluding that trial counsel was ineffective for failing to object to inadmissible social media evidence in conjunction with not eliciting testimony about the Petitioner's prior conflict with the victim and that trial counsel's performance prejudiced the Petitioner. On appeal, the State contends that the post-conviction court erred because trial counsel made a reasonable strategic decision when failing to object to the social media evidence and because the Petitioner cannot show that trial counsel's performance prejudiced him. After review, we affirm the post-conviction court's judgment.

## Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT W. WEDEMEYER, P.J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN and MATTHEW J. WILSON, JJ., joined.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and TaKisha M. Fitzgerald, Assistant District Attorney General, for the appellant, State of Tennessee.

Chloe A. Akers, Knoxville, Tennessee (on appeal and at post-conviction hearing), and Julia Trant (at post-conviction hearing), Knoxville, Tennessee, for the appellee, Jabriel Linzy.

# OPINION

## I. Facts

This case arises from an October 3, 2014 shooting, which resulted in the death of Dominique Johnson ("the victim"). Devonte Blair, who was sitting next to the victim on an apartment porch at the time of the shooting, was left uninjured. In connection with this shooting, the Knox County Grand Jury charged the Petitioner with one count of first-degree murder for the death of the victim, one count of attempted first degree murder of Mr. Blair, and one count of employing a firearm during the commission of a dangerous felony.

## A. Trial Facts

In our opinion on the Petitioner's direct appeal of his convictions, we summarized the pre-trial challenges to the evidence, which included a motion to exclude the Twitter posts on grounds that authentication of the messages would be impossible. *State v. Linzy*, No. E2016-01052-CCA-R3-CD, 2017 WL 3575871, at *1 (Tenn. Crim. App. Aug. 18, 2017). The trial court did not rule on the issue prior to trial, choosing to wait and see "'what kind of foundation' the State would lay. *Id.* During a jury-out hearing prior to trial, Mr. Blair, the attempted murder victim, testified that the Petitioner and the murder victim, Dominque Johnson, had an ongoing "beef" that was communicated "through communications between the victim and the Defendant "on Facebook and Twitter." *Id.*, 2017 WL 3575871 at *2. Mr. Blair indicated that he could identify the accounts through their Twitter handles and profile pictures. *See id.* The Petitioner continued to assert that the State could not authenticate the messages because they could not show that they had, in fact, been authored by the Petitioner and the victim. *See id.* The trial court ruled that questions about the identity of the parties to the messages went to the "weight that's to be given" but that "if there is a picture of [the Petitioner] with some derogatory or threatening comment associated with the victim in the case for which he is on trial for homicide, that is relevant [and] admissible and it's coming in." *Id.* (second alteration in original). The trial court later permitted the State to admit some Twitter messages through an investigator. *Id.*, 2017 WL 3575781, at 8.

The post-conviction court succinctly summarized the facts presented at trial, as relevant to this post-conviction appeal in its order as follows:

> [The Petitioner] was indicted for the first degree murder of [the victim], and the attempted first degree murder of Devonte Blair. The evidence received at trial established that Mr. Blair and Mr. Johnson were on the porch of a residence within Walter P. Taylor homes. Mr. Blair testified

2

that a vehicle stopped in front of the apartment and the driver fired multiple rounds at Mr. Blair and Mr. Johnson. One of these rounds [struck] Mr. Johnson resulting in his death. When Mr. Blair called E911, and when initially questioned by the Knoxville Police Department (KPD), Mr. Blair denied knowing the identity of the shooter. Within several hours, however, he identified the [P]etitioner (who he had known for years and had played youth football with) as the assailant.

The State also elicited testimony from Daesha Johnson who related that she had seen [the Petitioner] within Walter P. Taylor homes on the morning of the homicide and that [the Petitioner] appeared to be carrying a firearm. Ulysses Cameron testified that on the date of the homicide he "round around" with [the Petitioner], who admitted to Mr. Cameron that he was "in Walter P." on the date of the homicide and . . . [he] made a comment about a gun. Timothy Spears testified about an incident between the victim and [the Petitioner] that occurred at the fair approximately one month before the homicide. Mr. Spears described the victim as being "shaken", but the incident was "nothing severe". The State also introduced information captured from [the Petitioner's] social media account, to wit:

> "I lied to @DOMO_400, haha."
> "Domo n Kip r weenies, dey dnt got shit on me n chaos. We put in real wax. Dey get treated lik lil niccaz by hey homies, nun but respect dis way."
> "@DOMO_400: @raakiaa sound like a set-up."
> "@DOMO_400: @raaakiaa rakia u CNX C xrussed no more."
> "@DOMO_yolo_Gray" and then another website link.[]
> "I think I might have to beat on Domo if still here during class change, IDGAF, I've got some shit I need to get off my chest."
> "Dis 40 cal gunna fold you."
> "400 say they going to kill me, but if they waiting on me to die too die, they going to see me waiting for a min, Renegade loc da 1 minute army, # 10toesdown."
> "I'm going to the East Side. Who going to c in Walter C.? ? ? ? ? ?"
> "St8, straight, drop dis in zip locc dat right on my waistline is where I kept dat strap."

The post-conviction court related the messages that were read into the record at trial but acknowledged that the messages themselves, which had been admitted as a collective exhibit, were missing from the trial record.

3

After considering the aforesaid, along with other evidence presented by the State, the jury convicted the Petitioner of first degree murder, attempted first degree murder, and employing a firearm during the commission of a dangerous felony. The trial court sentenced the Petitioner to life in prison for the first-degree murder conviction, fifteen years for the attempted first degree murder conviction, and six years for the conviction of employing a firearm during the commission of a dangerous felony. The trial court ordered that the two shorter sentences be served consecutively to each other but concurrently with the life sentence. In his direct appeal, the Petitioner contended (1) that there was insufficient evidence to support his convictions and (2) that evidence from social media posts was improperly admitted. This court concluded that the evidence was sufficient to sustain the convictions. *Linzy*, 2017 WL 3575871, at *11-12. We also concluded that the social media posts were properly authenticated and admissible. *Id.* at *13-14.

## B. Post-Conviction Facts

The Petitioner timely filed a petition for post-conviction relief alleging, as is relevant on appeal, that he received the ineffective assistance of counsel because counsel failed to object to the relevance of certain social media evidence. The post-conviction court held a hearing during which the parties presented the following evidence.[1] The Petitioner testified that he was twenty-five years old and incarcerated for murder. His trial counsel ("Counsel") spent "enough" time preparing for his case. Counsel never provided him with discovery or with the social media evidence from "Twitter."[2] As an aspiring rapper in 2013, the Petitioner maintained a Twitter account to promote his music. The Petitioner, a man named "Cary Cush," and another man named "King" from "Blurb Out," who was his music producer, all ran the Petitioner's Twitter account. The Petitioner reiterated that multiple people had access to, and posted on, his Twitter account.

The Petitioner recalled that, in 2013, he and Dominique Booker, "Domo," got into a physical altercation, which led to the Petitioner's thirty-day suspension from high school. He said he "tweeted" about the altercation and about subsequent, ongoing interactions he had with Mr. Booker.

During cross-examination, the Petitioner agreed that police brought him in for questioning after the shooting and that he waived his rights and gave a statement. Law

---

[1]The post-conviction court found the Petitioner was entitled to post-conviction relief for Counsel's representation regarding the social media posts. We will limit the facts to those relevant to that issue.

[2]We acknowledge that Twitter is now named X, but we will refer to it herein as "Twitter" and the posts as "tweets" to comport with the witnesses' testimony.

enforcement officers asked him about his Twitter account and about whether he knew the victim. He said that he told officers that he did not "really" know the victim and that, although he may have communicated with him on social media, it would have only been to share his music. He said he did not know the victim's Twitter account was "Domo_400." The Petitioner testified that he did not view any of the Twitter messages prior to trial.

The Petitioner did not recall posting a photograph of himself with a gun in the Walter P. Taylor Homes, and he denied being at the housing complex on the day of the shooting. He said he never met Daesha Johnson and he did not see her the day of the shooting.

The Petitioner said that he knew Ulysses Cameron because he knew Mr. Cameron's brothers. He denied calling Mr. Cameron after the shooting to ask him for a ride. He denied telling Mr. Cameron that he "rolled the P. and you got it popping." The Petitioner said that Mr. Cameron contacted him via Facebook, which the Petitioner checked using his grandmother's cellphone. The Petitioner denied having a cell phone at the time of the shooting. Mr. Cameron asked to meet and talk on the day of the shooting. The Petitioner agreed, and said that, during their conversation, Mr. Cameron told him to get rid of his gun. The Petitioner denied that Mr. Cameron was his mentor in a gang and that he was in any way affiliated with any gang.

The Petitioner recalled meeting with Gary Lamb, who was a private investigator. The two went over the witnesses' statements, including Ms. Johnson's statement. The Petitioner said Ms. Johnson was "lying through her teeth" in her statement. He further recalled that she could not identify his picture from a photographic lineup. He agreed that he and Mr. Lamb watched the recording of Mr. Cameron's interview with police.

The Petitioner said that he was familiar with Mr. Blairbecause the two played on the same football team as children. He and Mr. Lamb watched Mr. Blair's police interview during which Mr. Blair identified the Petitioner as the shooter. He explained, however, that the police first asked Mr. Blair who the victim had "beef" with, and Mr. Blair responded two other people and then mentioned the Petitioner. Mr. Blair then said that the shooter looked like the Petitioner.

The Petitioner said that Counsel discussed the Tweets with him but said that they were inadmissible because they were all "about girls." The Petitioner thought the State sought to admit the Tweets to slander his character, but Counsel told him that the Tweets would be inadmissible because they could not be authenticated. The Petitioner agreed that his Twitter account was RG Loco.

5

During redirect examination, the Petitioner testified that Counsel never discussed with him impeachment material that could be used to impeach Ms. Johnson and Mr. Blair. The Petitioner further stated that Counsel did not tell him that the log from his Twitter account was six thousand pages of material and the two never reviewed any specific Tweets together.

The principal from the Petitioner's high school testified that the Petitioner had been in an altercation with another student named Dominique Booker, whose nickname was "Domo." Video footage from the school showed Mr. Booker and Mr. Booker's brother tackling the Petitioner from behind and physically assaulting him. The School Resource Officer ("SRO") initially thought that the Petitioner had pushed the SRO down, but the video footage showed it was the other two men who pushed the SRO down.

During cross-examination, the principal agreed that he did not know whether, at the time of the murder, the Petitioner also had issues with the victim, also nicknamed "Domo." He estimated that the fight, and ongoing conflict, between the Petitioner and Mr. Booker occurred in either December of 2013 or January of 2014.

Counsel testified that he represented the Petitioner at trial after the Petitioner's previous attorney was relieved of representation. Counsel had an investigator who had been assigned to the Petitioner's case since the beginning and who met with the Petitioner and ensured he understood the facts of the case. Counsel reviewed discovery, and then he "attacked" some of the social media posts based upon authentication and the prejudicial effect of the messages. Counsel noted that they appealed this issue post-trial to the Court of Criminal Appeals.

Counsel said that, additionally, he presented evidence that the house where the victim was shot was a drug house and that there had been other shootings at houses in the area during this time period. Counsel argued that the shooting was by someone making a hit on the house and not directed at the victim. He discussed this trial strategy with the Petitioner.

During cross-examination, Counsel testified that he was familiar with Twitter, Tweets, and Re-Tweets. The Petitioner's post-conviction counsel then offered a copy of the Petitioner's entire Twitter account, as subpoenaed by the State. Counsel acknowledged that there were 5,000 pages of Tweets and he reviewed each of those Tweets. He also filed a motion and argued the issue of authentication to the trial court. Counsel said he and the State argued about the relevance of the Tweets and that the trial court ruled that the Tweets were relevant. The trial court found that the Tweets constituted statements against the Petitioner's interest and that they were admissible as long as they were close in time to the murder.

The victim was shot and killed on October 3, 2014. Counsel identified some of the Tweets admitted by the State and the dates they were posted. He noted that the date on one of the Tweets, number 3681, was Friday, July 19, 2013. Tweet number 3824 read "Domo and Kip are weenies, they don't got shit on me and Chaos. We put in real wax. They get treated like little nickas by the homies. Non but respect dis way." That Tweet indicated that it was created on July 27, 2013. Counsel agreed that it was unclear to which "Domo" the Tweet referred.

Tweet 4186, which was dated August 10, 2013, says "RT @domo400" and then "@raakiaa sound like a setup." Counsel noted that RT meant "Re-Tweet," when someone reposted another user's original post. He further noted that "@domo400" was the victim's Twitter username. Tweet 4187 appeared to contain a link to a website and was dated Saturday, August 10, 2013. In a subsequent Tweet, "@domo_yolo_gray" was tagged with another website link. Counsel agreed that this user was different from "@domo400."

Tweet number 8847 read "I think I might have to be on Domo if still here during class change IDGAF. I've got some shit I need to get off my chest." This Tweet did not indicate to which Domo the Petitioner was referring. This Tweet was dated April 8, 2014. Tweet number 6780 stated "He does. He says. Dis 40 cal gonna fold you." This Tweet was created Sunday, December 15, 2013. Counsel said he was unsure what this Tweet meant and that the State did not call an expert to interpret the meaning of these Tweets.

Tweet number 79, created January 4, 2013, read "400 say they going to kill me, but if they waiting on me to die . . . they going to see me waiting for a min . . . renegade loc da one min army or #10toesdown." Counsel said he had "no idea" what this Tweet meant and that the State did not produce an expert to provide any comprehension during the trial.

Tweet number 1018, created February 15, 2013, read "I'm going to the east side, who going see in Walter C?" Tweet 495, created January 24, 2013, read, "ST8, straight, drop dis in zip locc dat right on my waistline is where I kept dat strap." Counsel knew that the Petitioner was an aspiring rapper, but he was unfamiliar with the rapper Young Jeezy. The Petitioner's counsel introduced a transcript of a song by the rapper Young Jeezy, and the first line of the song was identical to the text of Tweet 495.

After reviewing the evidence, the post-conviction court granted the Petitioner's petition for post-conviction relief on the basis of the social media evidence. It found:

> [Counsel] objected to the introduction of the social media posts and this Court ruled that posts wherein [the Petitioner] made threats to the victim, Mr. Johnson, were relevant in a first degree murder prosecution. Facially,

7

the social media posts set forth previously within this Order meet that test. A closer examination of these posts (of which the jury may or [may] not have been aware) shows several of these posts to have been "re-tweets", i.e. tweets that [the Petitioner] did not author yet endorsed by retweeting. Many of the tweets/retweets were authored/retweeted months before the homicide (which occurred on October 4, 2014, to wit:

> "I lied to @DOMO_400, haha." (07-19-2013)
> "Domo n Kip r weenies, dey dnt got shit on me n chaos. We put in real wax. Dey get treated lik lil niccaz by hey homies, nun but respect dis way."(07-19-2013)
> "@DOMO_400: @raakiaa sound like a set-up." (08-10-2013)
> "@DOMO_400: @raaakiaa rakia u CNX C xrussed no more." (08-10-2013)
> "@DOMO_yolo_Gray" and then another website link.[] (03-29-2014)
> "I think I might have to beat on Domo if still here during class change, IDGAF, I've got some shit I need to get off my chest." (04-08-2014).
> "Dis 40 cal gunna fold you." (12-15-2013)
> "400 say they going to kill me, but if they waiting on me to die too die, they going to see me waiting for a min, Renegade loc da 1 minute army, # 10toesdown." (01-04-2013)
> "I'm going to the East Side. Who going to c in Walter C.? ? ? ? ? ?" (02-15-2013)
> "St8, straight, drop dis in zip locc dat right on my waistline is where I kept dat strap." (01-24-2013)

Equally, if not more significantly, the jury was not informed that the Petitioner had a "beef", or dispute, with anyone else named/nicknamed "Domo". Garfield Adams, an Assistant Principal at South-Doyle High School, testified that [the Petitioner] was a former student who had an ongoing conflict with Dominique Booker. Mr. Adams testified that Dominique Booker and [the Petitioner] had been in a fight and that there existed significant conflict between the two. He also testified that Mr. Booker's nickname was "Domo". [Counsel] acknowledged in his testimony within the post-conviction hearing that he was aware of a fight that [the Petitioner] had at school. The information about the conflict with Dominique Booker, however, was not presented to the jury, nor was the same addressed during the pre-trial motions to exclude the [T]witter evidence.

8

As noted previously, this Court is required to give deference to trial counsel's tactical and strategic decisions when evaluating counsel's performance in hindsight. However, this Court can fathom no reason not to have presented the evidence about Dominique Booker to the Court when attempting to exclude the [T]witter information, and if that effort failed, to present that same evidence to the finder of fact when the case was tried. Moreover, it was critical that the jury be informed about the time lapse between the [T]weets/re[T]weets and the homicide. Because of the absence of exhibit sixty 960, this Court is left to speculate whether or not the jury may have seen the dates upon the exhibit. There exists no dispute that the transcript contains no mention of dates on the Twitter posts. [Counsel] is an experienced, capable, and very competent trial attorney. He worked hard for [the Petitioner] as [he] does for all of his clients. He was passionate in his defense of [the Petitioner] and poured himself completely into the effort when trying [the Petitioner's] case. His failure, however, to effectively address the social media posts when considered in conjunction with the failure to elicit testimony about [the Petitioner's] conflict with Dominique Booker does not meet the ABA standards demanded of attorneys who practice criminal defense.

The State urges this Court to consider the strength of its case when assessing whether or not [the Petitioner] has established the prejudice prong of *Strickland* and its progeny. The [S]tate's case centered around the eyewitness testimony of DeVonte Blair, and to a lesser extent, Daesha Johnson. Each witness's direct and circumstantial identification of [the Petitioner] as the shooter were significantly bolstered, however, by the social media evidence which suggested an ongoing "beef" between [the Petitioner and Dominique Johnson. The absence of critical information that was readily available which would have contradicted and/or mitigated the impact of the Twitter evidence isn't insignificant. A second jury may convict [the Petitioner] of first degree murder, there exists ample evidence suggesting his culpability. Yet before the criminal justice system should be content when incarcerating a human being for the balance of that person's life, it should be confident that the process by which that life was condemned is fair and just.

The post-conviction court granted the Petitioner's petition for post-conviction relief, finding that he had established by clear and convincing evidence that he had received the ineffective assistance of counsel. The court ordered that the Petitioner's plea of not guilty be reinstated and that he be held without bond pending disposition of his case.

It is from this judgment that the State now appeals.

9

## II. Analysis

On appeal, the State contends that the post-conviction court erred when it granted the Petitioner's petition for post-conviction relief because Counsel made a strategic decision regarding challenging the social media evidence. The State further posits that any challenge to the social media evidence would not have led to its exclusion nor would have undermined confidence in the verdict. The Petitioner disagrees, contending that the post-conviction court properly exercised its discretion when it found that Counsel was ineffective. We agree with the Petitioner.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. T.C.A. §40-30-103. The petitioner bears the burden of proving the factual allegations in the petition for post-conviction relief by clear and convincing evidence. T.C.A. § 40-30-110(f). Upon review, this court will not re-weigh or re-evaluate the evidence below; all questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge, not the appellate courts. *Momon v. State*, 18 S.W.3d 152, 156 (Tenn. 1999) (citing *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997)). A post-conviction court's factual findings are subject to a *de novo* review by this court; however, we must accord these factual findings a presumption of correctness, which can be overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. *Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely *de novo* review by this court, with no presumption of correctness. *Id.* at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution. *State v. White*, 114 S.W.3d 469, 475 (Tenn. 2003); *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999); *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). The following two-prong test directs a court's evaluation of a claim for ineffectiveness:

> First, the [petitioner] must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the [petitioner] by the Sixth Amendment. Second, the [petitioner] must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the [petitioner] of a fair trial, a trial whose result is reliable. Unless a [petitioner] makes both showings, it cannot be

said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see State v. Melson*, 772 S.W.2d 417, 419 (Tenn. 1989).

In reviewing a claim of ineffective assistance of counsel, this court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. *Baxter*, 523 S.W.2d at 936. The reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. *Strickland*, 466 U.S. at 690; *State v. Mitchell*, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court should avoid the "distorting effects of hindsight" and "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 689-90. In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Burns*, 6 S.W.3d at 462.

Finally, we note that a defendant in a criminal case is not entitled to perfect representation, only constitutionally adequate representation. *Denton v. State*, 945 S.W.2d 793, 796 (Tenn. Crim. App. 1996). In other words, "in considering claims of ineffective assistance of counsel, 'we address not what is prudent or appropriate, but only what is constitutionally compelled.'" *Burger v. Kemp*, 483 U.S. 776, 794 (1987) (quoting *United States v. Cronic*, 466 U.S. 648, 665 n.38 (1984)). Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable representation. However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation." *House v. State*, 44 S.W.3d 508, 515 (Tenn. 2001) (quoting *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996)).

If the petitioner shows that counsel's representation fell below a reasonable standard, then the petitioner must satisfy the prejudice prong of the *Strickland* test by demonstrating "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694; *see Nichols v. State*, 90 S.W.3d 576, 587 (Tenn. 2002). This reasonable probability must be "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *see Harris v. State*, 875 S.W.2d 662, 665 (Tenn. 1994).

In the case under submission, the post-conviction court found that the Petitioner was entitled to post-conviction relief because Counsel's representation fell below a reasonable standard. While offering Counsel praise, the court noted that the evidence at the post-conviction hearing showed that the Petitioner was engaged in an ongoing dispute with a fellow student Dominique Booker, nicknamed "Domo." The two were involved in a physical altercation at school in December of 2013 or January of 2014. At trial, the State introduced Tweets from April of 2014 that indicated that if "Domo" was present during class change the Petitioner was going to have a negative interaction with him. The State also introduced evidence that the victim, named Dominique Johnson, went by the nickname "Domo" and that he had an ongoing dispute with the Petitioner. The homicide in this case occurred October 3, 2014.

While aware of the school fight, Counsel made no objection to the relevance of the Tweets evidence or that the Tweets may confuse the jury. He did object based upon authentication, and the trial court ruled that the Tweets were admissible if the were close in time to the murder.

Other Tweets admitted by the State, which seemed problematic for the defense— "400 say they going to kill me, but if they waiting on me to die too die, they going to see me waiting for a min, Renegade loc da 1 minute army, # 10toesdown" and "I'm going to the East Side. Who going to c in Walter C.? ? ? ? ? ?"—were posted in January and February of 2013, respectively. This was twenty or twenty-one months before the homicide in this case. Counsel did not object that to these Tweets on grounds that they fell beyond the "close in time" ruling of the trial court. Counsel also did not cross-examine the witness offering the Tweets about the extended period of time between the Tweets and the murder.

After our thorough review, we agree with the trial court that Counsel was an effective and hard-working advocate. We disagree with the State, however, that he made a strategic decision regarding these Tweets. As previously stated, Counsel was not originally appointed to the Petitioner's case, and there were five thousand pages of Tweets offered by the State. In his preparation, it appears that Counsel did not identify that the Petitioner had an ongoing dispute with two men, both nicknamed "Domo," only one of whom was the victim in this case. It is also unclear whether Counsel realized that the dates of some of these Tweets were twenty months before the homicide in this case. We agree with the post-conviction court that there does not appear to be a strategic reason, and Counsel did not articulate one, to opt not to raise those facts before the jury. In light of this, we conclude that the post-conviction court did not err when it concluded that Counsel rendered ineffective assistance when he failed to adequately address the social media posts.

The State also encourages us to conclude that the post-conviction court erred when it found that the Petitioner had proven that the admission of the Tweets prejudiced him. We note that the post-conviction court acknowledged that the Petitioner might be convicted if and when he is tried again for these crimes based upon witnesses' testimony. The post-conviction court also noted, however, that the impact of the Tweets was not insignificant to the case. The post-conviction court noted that the State's case centered around the eyewitness testimony of Mr. Blair, and to a lesser extent, Ms. Johnson. The post-conviction court found that each witness's "direct and circumstantial identification" of the Petitioner as the shooter "was significantly bolstered by the social media evidence, which suggested an ongoing 'beef' between" the Petitioner and Dominique Johnson. The post-conviction court properly concluded that the absence of critical information, namely that there was another dispute with another "Domo" and the extended duration between the Tweets and the murder, prejudiced the Petitioner. Accordingly, we affirm the post-conviction court's judgment.

### III. Conclusion

Based on the foregoing reasoning, the judgment of the post-conviction court is affirmed. The case is remanded for proceedings consistent with the post-conviction court's judgment.

_____s/ *ROBERT W. WEDEMEYER*_____
ROBERT W. WEDEMEYER, PRESIDING JUDGE

13